**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DR. ERNESTO A. LEE**<br><br>v.<br><br>**UNIVERSITY OF PENNSYLVANIA, SCHOOL OF DENTAL MEDICINE, DR. DANA GRAVES, and DR. MARK WOLFF** | **CIVIL ACTION**<br><br>**NO. 19-835** |

## MEMORANDUM RE: MOTION FOR SUMMARY JUDGMENT

**Baylson, J.**                                                        **May 5, 2021**

## I.     Introduction

Ernesto Lee is a Panamanian-born dentist, who previously split his time working part-time at University of Pennsylvania Dental School ("Penn") and running his own private practice. Lee claims that Penn — as well as former Interim Dean Dana Graves and Dean Mark Wolff (collectively, "Defendants") — defamed him and discriminated against him based on his disability and national origin.

During his employment at Penn, Lee was diagnosed with leukemia, requiring expensive and physically taxing chemotherapy treatments. He was able to negotiate concessions from Penn's prior dean to reclassify him as a full-time employee in name only for insurance purposes and to ensure that he would have recovery time from his morning treatment sessions, which often left him unable to work until mid-morning. Lee argues that Defendants later terminated these concessions, which he contends was discriminatory both in terms of his disability and his national origin.

Additionally, Lee argues that Defendants committed libel and slander by allegedly circulating or making statements regarding a document that suggested that Lee behaved

inappropriately with his students or acted unethically in poaching patients from Penn for his private practice. The only evidence of these statements is a letter finding such allegations to be without merit.

Defendants moved for summary judgment on all of Lee's claims, and the Court will grant that motion. For each claim, Lee simply fails to cite evidence in the record upon which a reasonable jury could find in his favor. Without any evidentiary support, Lee's claims cannot survive summary judgment.

## II.   **Procedural History**

Lee initiated this litigation with his first complaint in February 2019. ECF 1. Defendants moved for dismissal of all counts for failure to state a claim. ECF 5.

After considering briefing, the Court granted the motion in part and denied it in part. Lee v. Penn., No. 19-835, 2019 WL 4060843 (E.D. Pa. Aug. 27, 2019) ("Lee I") (also available at ECF 9). The initial complaint focused on the same four causes of action present in the amended complaint, albeit with different allegations in support.

Count I (disability discrimination under the ADA): The Court first dismissed claims against Wolff and Graves with prejudice because the ADA does not provide for individual liability. Next, it dismissed claims against Penn without prejudice, requiring further specificity to establish Lee's claims of a qualifying disability.

Count II (national origin discrimination under Title VII): The Court denied the motion to dismiss as it pertained to Count II, finding that Lee's allegations constituted a "plausible" claim for national origin discrimination.

Count III (national origin and disability discrimination under PHRA): For claims against Penn, the Court reiterated its conclusions from Counts I and II, dismissing without prejudice

disability discrimination claims for insufficient factual allegations but allowing the national origin discrimination claims to proceed. The Court dismissed both bases of the PHRA claim against Wolff and Graves because the complaint did not sufficiently plead that they aided or abetted any alleged violation, as required for individual liability under the PHRA.

Count IV (defamation through libel and slander): The Court dismissed Lee's defamation claims without prejudice. Lee's libel allegations were legally insufficient, as the only discussed document denounced several negative statements about Lee as "without basis." The slander allegations also failed to identify key details about the challenged statements, i.e. the "who, what, and when" of the statements.

Following the Lee I decision, Lee amended his complaint in October 2019. ECF 18. Over the following year, the parties undertook discovery, and, in December 2020, Defendants filed the present motion for summary judgment. ECF 36. Lee filed his opposition, ECF 38, and Defendants replied in support of the motion, ECF 39.

Finding that Lee's opposition lacked the court-required statement of disputed and undisputed facts, the Court ordered Lee to file a supplemental document to satisfy this requirement, ECF 40, which Lee then did, ECF 41. At the Court's direction, Defendants filed their responses to Lee's statement of facts, ECF 42, and substitute reply brief, ECF 43, to address Lee's supplemental document.[1]

On March 24, 2021, the Court held oral argument by teleconference regarding the present motion. ECF 47. At the conclusion of the hearing, the Court granted each party permission to file post-hearing supplemental briefs in support of their arguments. Id. The parties did so on April

---

[1] For the present opinion, the Court will consider Defendants' substitute reply brief, ECF 41, and not their initial reply brief, ECF 39.

15, 2021.  ECF 49, 50.

## III.   **Factual Contentions**

The following facts are drawn from the parties' statements of undisputed material facts ("SOFs") and their counterstatements of facts ("CSOFs") to the other parties' contentions.  In adjudicating these motions for summary judgment, the Court relies on undisputed facts and, where disputed, record-based facts and justifiable inferences most favorable to the non-moving party (Lee).  Barefoot Architect, Inc. v. Bunge, 632 F.3d 822, 826 (3d Cir. 2011).

Where there is a factual contention with evidentiary support and the opposing party denies that contention without citing any record-based evidence, the Court considers it admitted.  See e.g., Acclaim Sys., Inc. v. Infosys, Ltd., No. 13-7336, 2016 WL 974136, at *1 n.1 (E.D. Pa. Mar. 14, 2016) (Pratter, J.) (in summary judgment motion, relying on "the undisputed facts that [the plaintiff] has either admitted, or for which [the plaintiff] has failed to provide counter citations to the record").  Several of Lee's CSOFs purport to dispute Defendants' proposed SOFs without supporting evidence in the record.  The Court will discuss those below, see Section IV (Improperly Denied Facts Deemed Admitted); if undisputed, the Court must consider them admitted as undisputed for the purposes of this motion.

### a)  Background

Lee is a Panamanian-born dentist.  ECF 41 ¶¶ 2, 60.  He was diagnosed with leukemia, a medical condition that required Lee to undergo chemotherapy, in or around 2003.  Id. at ¶ 8.

In 2004, Penn hired him as a part-time faculty member in its post-doctoral Periodontal Prosthesis Program.  Id. at ¶ 1.  In this position, Lee initially committed to one year of working two days a week for an annual salary of $50,000.  Id.  Lee continued working for Penn in various positions, including serving as the Director of the Periodontal Prosthesis Program from 2007 to

2017.  Id. at ¶¶4–6, 17.  During his employment at Penn, Lee never taught there more than two days a week.  Id. at ¶ 9.

In 2005, Lee established a private dental practice, at which he is the sole practitioner.  Id. at ¶ 2.  Lee initially worked there four days a week, but he reduced that amount to three days a week in 2014.  Id.  He also has worked in various consultant roles from 2003 to present.  Id. at ¶ 3.  Lee continues to work at his private practice three days a week.  Id. at ¶ 2.

b) <u>Initial Accommodations</u>

In 2009, Lee lost his medical insurance that he had held through his private practice.  Id. at ¶ 7.  He told Penn's then-Dean, Dennis Kinane, that he was considering quitting his position at Penn so he could switch to full-time work at his private practice, which might allow him to afford private health insurance.  Id.  The conversation resurfaced again in 2011, when Lee lost coverage from a new insurance program.  Id. at ¶ 8.  Kinane offered him a concession — Lee could participate in Penn's insurance program and be subsidized as if he were a full-time employee but still work part-time.  Id.  Lee accepted, and Penn executed a contract reclassifying Lee as a full-time employee as of August 2011.  Id. at ¶¶ 9, 9(c).

Under this plan, Lee was listed as a full-time Dental Network Clinician for Penn, enabling him to receive a full-time employee's benefits.  Id. at ¶¶9(b), 9(c).  Despite this "reclassification" to full-time employee for benefits purposes, Lee's job requirements never changed to full-time or clinical work; he continued to work for Penn part-time and only in administrative and teaching roles.  Id. at ¶ 9(c).  Lee continued to work three days a week at his private practice.  Id. at ¶ 2.

Additionally, at some point, Penn granted Lee permission to start his workday slightly later in the morning — "about 9:30, 10 o'clock," ECF 36-7 (Lee Dep.) at 122:14–21 — to accommodate his daily chemotherapy treatments and its side effects.  ECF 41 at ¶ 8(a).  Lee

continued to receive this late-start accommodation throughout his employment at Penn. ECF 36-7 (Lee Dep.) at 124:10-14 (Q: "[D]id you always get the accommodation where you were allowed to start at 9:30 or 10?" A: "Okay. So I'll tell you I — I started at 9:30 or 10. Yes."). His refusal to work earlier, however, sometimes "created tension" with Penn. Id. at 23:12–18.

    c)  <u>Complaints against Lee and Removal from Director Role</u>

Kinane would continue in his position as dean until late 2017, ECF 41 at ¶ 27. During this time, defendant Dr. Dana Graves served under Kinane as Interim Chair of Periodontics from 2015 to 2017. Id. at ¶¶ 10, 11.

As dean, Kinane told Graves about faculty members' concerns regarding Lee, in which they alleged issues related to sexual harassment, scientific misconduct, and planning patient treatment. Id. at ¶¶ 11, 12. Graves never investigated the allegations and had no independent knowledge of what occurred to give rise to them. Id. at ¶ 13. Kinane told Graves, however, that Kinane's office had investigated the matters and concluded that "Ernesto [Lee] was cleared of the charges." Id. at ¶¶ 14, 15. Graves later informed Lee personally that "the charges were investigated," they were found to be "without basis," and "a letter [to that effect] was sent to the Provost." ECF 36-7 (Lee Dep.) at 175:13–176:6; ECF 41 at ¶ 15.

In late September 2017, Dr. Ricardo Teles, the Chair of Lee's department, decided to replace Lee as the Director of Periodontal Prosthesis, id. at ¶ 17(a), which Lee testified was related to the complaints made against him, id. at ¶ 18. Teles reported concerns about student morale, including concerns that Lee exercised favoritism among the students. Id. at ¶ 26.

By removing Lee as Director of Periodontal Prosthesis, Penn reduced Lee's annual compensation by $15,000. Id. at ¶ 17(a). Lee's two-day-a-week teaching role was unaffected by this decision. Id.

d) Lee's Conflicts with New Deans

Kinane resigned from his position as dean at the end of 2017, after which Graves took over the position in an interim role. Id. at ¶ 27. Shortly after Graves assumed this role, the Interim Dean of Periodontics, Dr. Uri Hangorsky, informed him that two employees, Lee and "Dr. X1," were classified as full-time employees yet did not work full-time hours. Id. at ¶ 28.

Graves then began to discuss this misclassification issue with Lee. Id. at ¶ 31; see also Section IV(a) (discussing Graves' awareness of Lee's leukemia). As part of these discussions, Lee attempted to convince Graves and Hangorsky that Lee's off-site consulting duties should count toward his employment status and rendered him a full-time employee. ECF 41 at ¶ 32. They were not convinced. Id.

In May 2018, Graves attempted to enforce the formal terms of Lee's contract, as created under Kinane. Id. at ¶ 33. He offered Lee the choice of increasing his hours to full-time status — including three days a week in a clinical capacity as detailed in his contract — or adjusting his contract to reflect his part-time, teaching-only schedule. Id.

Lee refused either option and said he would "continue to perform my duties in a manner consistent with the last 10 years of my employment, except for endeavors related to the Program Director role. I expect the administration to fulfill their contractual obligations." Id. at ¶ 34.

Over the next two months, Lee and Graves continued their communications on this issue. Id. at ¶¶ 35–39. In his responses, Lee argued that Graves' proposal would burden him with "a heavy seminar load with no preparation time and an inadequate stipend" compared to his peers. Id. at ¶ 36. He also told Graves that Penn had deprived him of his due process rights in its handling of the earlier complaints against him by "allow[ing] rumors about false accusations to be publicized and persist, damaging my reputation." Id. at ¶ 37. Graves responded that Penn and the

Dean's Office had found those claims to be without merit, but the conversation between the two failed to reach a consensus.  Id. at ¶¶ 38, 39.

At the beginning of July 2018, Wolff assumed the role of Dean of the Dental School, providing a long-term replacement for Graves.  Id. at ¶ 40.  Prior to this position, Wolff did not know Lee.  Id. at ¶ 41.  After becoming dean, Wolff learned from Hangorsky that Lee was classified as full-time but did not work full-time at Penn.  Id. at ¶ 28.

In August 2018, Lee and Wolff met to discuss options for reconciling Lee's and Penn's expectations.  Id. at ¶ 46.  In September 2018, Wolff wrote Lee a letter, offering him three options: (1) work full-time at Penn and receive full-time salary and benefits, (2) work 17.5–26 hours per week and receive partially subsidized health care benefits, or (3) work under 17.5 hours per week and receive unsubsidized benefits, without any salary reductions.  Id. at ¶ 48.

Lee responded with a counteroffer:  he proposed "a part-time contract that would include a raise in compensation equivalent to the health and tuition benefits, in addition to an adjustment to counter the income tax implications."  Id. at ¶ 50.  Wolff refused; he told Lee that he would be classified as a part-time employee as commensurate with his duties and receive part-time benefits and an unchanged salary.  Id. at ¶ 51.  He also told Lee that he would need confirmation whether Lee wanted to continue to serve out the remainder of his contract through July 2019.  Id.  Lee asked if he was being terminated, id. at ¶ 52, and Wolff told him he was not, id. at ¶ 53, although he would not receive the same benefits he had previously received, id. at ¶ 53(a).

About two weeks after this exchange, on October 26, 2018, Lee resigned from Penn.  Id. at ¶ 56; ECF 36-31 (Hangorsky letter regarding Lee's resignation).  Lee's contract would otherwise have expired in July 2019, ECF 41 at ¶ 36, but Wolff "let [Lee's] contract run to its end" and did "not renew it" at that time.  ECF 38-2 (Graves Dep.) at 182:22–183:5.

e) <u>Allegedly Discriminatory Comments</u>

Lee was born and raised speaking Spanish in Panama; his cultural identity is Hispanic. ECF 41 at ¶ 64(a). While working at Penn, Lee was often "the only Spanish-speaking person in the building" and faced inappropriate workplace comments about Hispanic stereotypes. <u>Id.</u> The subject of these comments often revolved around perceptions of Central Americans being poor, being lazy, or having harmful "macho" attitudes. <u>Id.</u>

Kinane, for example, told Lee that he had cultural issues in the way that he spoke to women and in asserting a "macho" attitude. <u>Id.</u> at ¶ 66; ECF 36-7 (Lee Dep.) at 24:16–25:6. Both Kinane and Graves would comment that "you guys . . . like to come in late" by using "mañana" as an excuse for procrastination. ECF 36-7 (Lee Dep.) at 24:11–15.

Wolff never made jokes about Lee's national origin or made comments about macho culture. ECF 41 at ¶ 68. Wolff has used the word "mañana" in casual conversation to refer to the following morning; he has never said it in conversation with or regarding Lee. ECF 38-1 (Wolff Dep.) at 193:8–15. There is no other record evidence that Wolff has used Spanish or otherwise made comments that indicate a bias against Panamanians, Central Americans, or Hispanic people. ECF 41 at ¶ 68.

f) <u>Allegedly Defamatory Statements</u>

Lee argues that Defendants defamed him by "plac[ing] in writing allegations that [Defendants] knew to be false, stating that Plaintiff engaged in inappropriate behavior with female students and other women and that he acted dishonestly in 'stealing' University dental patients for Plaintiff's private practice." <u>Id.</u> at ¶ 72 (quoting Amended Complaint).

Lee has produced no evidence of Defendants making these statements, whether written or otherwise. <u>Id.</u> at ¶¶ 76, 77, 77(a), <u>see also</u> Section IV(b) & (d). The only identified statements are

from Defendants' denunciation of any allegations against Lee as without merit; these are not defamatory statements.  Lee I, 2019 WL 4060843, at *6 (also available at ECF 9) ("that a writing stated that false allegations were indeed false is not sufficient" to plead defamation).

## IV.  Improperly Denied Facts Deemed Admitted

For purposes of a summary judgment, the non-moving party can rebut the moving party's factual contentions by either "citing to particular parts of materials on the record" or "showing that the materials cited do not establish" the moving party's contention.  Fed. R. Civ. P. 56(c).  "In order to overcome summary judgment once Defendant has set forth such facts, however, Plaintiff must actually point to facts in the record to counter Defendant's evidence."  1 W. Main St., LLC v. Tower Nat'l Ins. Co., No. 14-6967, 2016 WL 1043545, at *8 (E.D. Pa. Mar. 15, 2016) (Jones, J.).  Where the plaintiff fails to identify evidentiary support to dispute the defendant's supported factual contentions, "there is no material dispute" of that factual contention, and it is considered undisputed for the purposes of summary judgment.  See, e.g., id.; Acclaim Sys., Inc., 2016 WL 974136, at *1 n.1.[2]

Lee denied most of Defendants' proposed SOFs.  Several of these denials included proper citations to the evidentiary record, and the Court considers those factual contentions in the light most favorable to Lee.

But other CSOFs are not supported by the record.  A discussion of these contentions, and the extent to which the Court can consider them in the present motion, follows.

---

[2] While the Court can review the exhibits to the parties' briefs (and has done so here), "[t]he court should not be tasked with combing through the record in order to find support for the statements included in the submissions."  McGinnis v. Donahoe, No. 12-1880, 2015 WL 507043, at *1 n.1 (W.D. Pa. Feb. 6, 2015) (citing Perkins v. City of Elizabeth, 412 F. App'x 554, 555 (3d Cir. 2011)).

a) <u>Defendants' Knowledge of Lee's Accommodations</u>

Throughout his contentions, Lee repeatedly cites on 8(a) through 8(c) and 9(a) through 9(c) (collectively, the "Knowledge CSOFs") as bases for denying Defendants' contentions. But, for each of these, the CSOF does not match up wholly with the record citations' contents. An examination of each CSOF is therefore worthwhile.

In 8(a) and 8(b), Lee contends that Wolff, Graves, and Penn were aware that he had morning chemotherapy treatments for his leukemia and required a late-start accommodation for treatment and recovery from the physical side-effects.

For 8(a), Lee relies on Wolff's testimony to discuss Wolff's awareness of Lee's leukemia. The cited testimony shows Wolff initially stating, "I remember [Lee] wanted to get his chemotherapy in the morning," ECF 38-1 (Wolff Dep.) at 170:5–6. Wolff later clarified that statement in his deposition, however, saying "I never knew he had leukemia" and "I need to be more specific. I don't know that I said chemo. But if I did, that was certainly a misspeak. It was for his medical care; he was being given off for his medical treatment." <u>Id.</u> at 175:3, 175:17–21. In the light most favorable to the non-movant,[3] however, Wolff's testimony supports a conclusion that he was aware of Lee's need for a late start to accommodate chemotherapy treatment.

A similar conclusion applies to 8(b) — Graves' cited deposition testimony demonstrates that he was aware that Lee had a medical condition requiring a late-start. ECF 38-2 (Graves Dep.) at 171:10–22. While Graves was not aware of Lee's specific medical condition when discussions first began about removing Lee's full-time employee benefits, <u>id.</u> at 110:9–111:20 "[Lee] at some

---

[3] Even if a deponent corrected a purported misstatement "later in the deposition," "the credibility of [the] retraction may be disputed." <u>Mest v. Cabot Corp.</u>, 449 F.3d 502, 514 (3d Cir. 2006). As such, the Court cannot take the retraction at face value here, so the conflict between the original testimony and the retraction must be viewed in Lee's favor. <u>Id.</u>

point told [Graves] that it was leukemia" for which he was receiving treatment, id. at 171:18–22. The record does not indicate a specific timeline. For the purposes of this motion, therefore, the Court must assume that Graves was aware of Lee's leukemia before Lee's departure from Penn.

In 8(c) and the nearly identical 9(a), Lee contends that Defendants were aware that his job responsibilities and office work schedule were concessions reached with Kinane. Record evidence supports the contention that these were indeed concessions from Kinane. See ECF 36-7 (Lee Dep.) at 124:10–14 (explaining late-start); ECF 36-11 (letter explaining Lee's job duties and benefits). But Lee's record citations do not indicate that Wolff or Graves was aware of these concessions as disability-based accommodations, ECF 38-2 (Graves Dep.) at 175:23–176:6 (Graves was "unaware" of "any contractual or accommodation request from [Lee]," either "formally or informally"), or that Lee's classification as a full-time clinician was linked to any disability, ECF 38-1 (Wolff Dep.) at 120:11–121:6 (Wolff was unaware why the clinical department of Penn paid Lee's salary when he was employed as a lecturer).

In 9(b) and 9(c), Lee contends that Defendants were aware that (1) Kinane classified his role as a full-time clinician for benefits purposes, (2) Kinane never expected Lee to change his job duties to clinical or full-time work to receive those benefits, and (3) Kinane offered Lee a flexible work schedule to accommodate medical treatments. In support, Lee cites Graves' deposition, which states that Lee told him that "Kinane had an understanding that the contract was not to be enforced [and Lee's] job was something different." ECF 38-2 (Graves Dep.) at 187:20–188:7. Graves recognized that "there may have been a private arrangement between [Kinane] and [Lee]" that was different than Lee's written job description, but he did not believe that arrangement was "enforceable." Id. at 189:3–22.

The Court will consider CSOF 8(a) through 8(c) and 9(a) through 9(c) as effectively

disputing Defendants' SOF 8 and 9 and will view those contentions in Lee's favor.

But Lee attempts to incorporate the Knowledge CSOFs to challenge a wide array of Defendants' factual contentions, many of which are largely or wholly unrelated to the underlying record evidence. For example, Lee's sole justification for disputing Defendants' SOF 29 is by incorporating the Knowledge CSOFs. But SOF 29 contains only the unrelated contention that Lee worked at Penn two days a week and spent another three weekdays working in private practice and consulting roles. ECF 41. Simply incorporating unrelated evidence cannot create a genuine dispute with contentions that have supporting record evidence. The Court therefore will treat as undisputed Defendants' SOFs 28–30, 31 (to the extent it reflects Lee and Graves having conversations regarding Lee's job description), and 32–35.[4]

 b) <u>Contentions based on Testimony of Richard Le</u>

Plaintiff Lee disputes several of Defendants' SOFs based on deposition testimony of Richard Le, Human Resources Director for Penn (the dental school). Richard Le testified that he was not aware of "any complaints of research or intellectual dishonesty against Ernesto Lee." ECF 38-4 (R. Le Dep.) at 47:16–20. But Richard Le's testimony concerned only his personal awareness in matters administered through his office; he also testified that different sub-organizations within the larger University of Pennsylvania organization might keep their own records and his was only one of several offices to which such complaints might be reported. <u>Id.</u> at 46:12–47:15. Even viewing Richard Le's testimony in the light most favorable to the non-movant, the Court does not find that Richard Le's testimony supports Plaintiff Lee's contentions that "there

---

[4] Lee also offers CSOF 34(a) to dispute SOF 34. But CSOF 34(a) relies exclusively on the same unrelated testimony as the Knowledge CSOFs and does not create a genuine issue to that contention.

was a complete lack of record of such complaints or of any investigation, at any level or in any executive of management office of any of defendant University of Pennsylvania's departments, offices, schools, or organizations," ECF 41 at ¶ 12(a); that "complaints of misconduct could not have been made," id. at ¶ 14(a); or similar interpretations of the testimony to preclude the existence of any complaints against Plaintiff Lee.

Defendants' SOFs that Plaintiff Lee contested only through this unsupported framing of Richard Le's testimony are therefore <u>undisputed</u> for the purposes of this opinion. These include Defendants' SOFs 12, 14–16, 18, 19, 21–24, 26, 38, 73, and 77.[5]

c) <u>Lee's Termination</u>

Defendants' SOF 56 contends that "[Lee] not terminated. He resigned." In support, Defendants' provide a letter from Hangorsky documenting Lee's resignation. ECF 36-31. Lee denied this only by incorporated CSOFs: the Knowledge CSOFs, 34(a), 42(a), 43(a), 49(a), and 53(a). None of the evidence cited by these CSOFs suggests that Lee was terminated or that he did not resign. At most, Lee offers evidence that "Defendants refused to restore any of the accommodations under which Plaintiff had been performing [his] responsibilities . . . for more than a decade." ECF 41 at ¶ 53(a). But this is not evidence that he was terminated, only that he lost his full-time insurance benefits. SOF 56 is therefore undisputed.

d) <u>Wholly Unsupported Denials</u>

Lee denies Defendants' SOFs 39, 71, and 76 without any citation to the record or explanation for the denial. This is insufficient under Rule 56, and, therefore, those SOFs are

---

[5] Additionally, the Court will disregard CSOF 25(a), which again is premised on Richard Le's testimony, as unsupported by the record. CSOF 25(b) is supported to the extent that it asserts that Graves knew of Plaintiff Lee's scheduling needs (as discussed in Section IV(a)), but not to the extent it asserts that Graves made false statements to students, which is unsupported.

deemed undisputed for the present opinion.

## V. <u>Legal Standard</u>

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." <u>Id.</u>

A party seeking summary judgment "bears the initial burden of demonstrating the absence of any genuine issue of material fact." <u>Huang v. BP Amoco Corp.</u>, 271 F.3d 560, 564 (3d Cir. 2001) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). The moving party can satisfy this burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325. After the moving party has met its initial burden, the adverse party's response must set out specific facts, and not mere allegations, showing a genuine issue for trial by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986). "[T]he non-moving party must make a showing sufficient to establish the existence of each element of his case on which he will bear the burden of proof at trial." <u>Huang</u>, 271 F.3d at 564.

Under Rule 56, this Court must view the evidence presented on the motion in the light most favorable to the non-moving party. <u>Anderson</u>, 477 U.S. at 255.

## VI. <u>Analysis</u>

Lee currently has four counts pending: Count I (disability discrimination under the ADA; Count II (national origin discrimination under Title VII); Count III (national origin and disability

discrimination under PHRA);[6] and Count IV (defamation through libel and slander).

Defendants have moved for summary judgment on all counts, and, viewing the evidence in the light most favorable to Lee, the Court must agree. For disability discrimination, it is undisputed that Lee sought two accommodations: a late-start and full-time employee benefits for a part-time position. He concedes that he never lost the former, and the latter is not a reasonable accommodation as a matter of law. For national origin discrimination, there is simply no evidence that the lone decisionmaker, Wolff, exhibited any discriminatory intent — occasional use of one neutral word in another language is not evidence of bias. For defamation, Lee has failed to identify evidence that a defendant made a written or non-written defamatory comment about him. The Court will GRANT Defendants' motion for summary judgment on all counts.

a) Disability Discrimination

Lee contends that Defendants discriminated against him based on his disability (leukemia) by denying him two reasonable accommodations for that disability . But the record fails to support Lee's contentions; he continually received one accommodation and the other is not recognized as an accommodation under the law. "In order for a plaintiff to establish a prima facie failure to accommodate case under the ADA, he must demonstrate that: (1) he had a disability; (2) the employer had notice of this disability; (3) he can perform the essential functions of his position with a reasonable accommodation; and (4) the employer failed to provide a reasonable accommodation." McCall v. City of Phila., No. 11-5689, 2013 WL 5823873, at *23 (E.D. Pa. Oct. 29, 2013) (Buckwalter, J.). It is undisputed that Lee had a qualifying disability and that he was

---

[6] The PHRA claims are functionally identical to their federal law counterparts, although the PHRA also provides for individual liability for some supervisory employees. Lee I, 2019 WL 4060843, at *5–6. Lee asserts his federal law claims only against Penn and his state law claims against all Defendants.

otherwise qualified to hold his position in Penn's faculty. Furthermore, both Wolff and Graves were aware of Lee's disability. See Section IV(a). The remaining issue is whether Lee can demonstrate the denial of a reasonable accommodation.[7] Lee fails to do so. The Court will therefore GRANT Defendants' summary judgment for Lee's disability discrimination claims.

Lee contends that Defendants denied him two "reasonable accommodations": a late-start to accommodate his chemotherapy treatments and providing him full-time benefits while working part-time. Lee concedes that he always received the late-start accommodation, ECF 47 (Hearing Tr.) at 7:17–23; it may have caused scheduling difficulties, but there is no evidence that Defendants ever tried to revoke it.

The remaining accommodation — receiving full-time benefits for part-time work — is not a reasonable accommodation as a matter of law. First, Lee directly stated that his "medical condition did not prevent him from working full-time." ECF 50 at 4 (emphasis original). The record is undisputed that Lee has worked full-time throughout the described events; the record is clear he wanted to maintain his private practice while receiving enhanced benefits for his part-time work at Penn. Defendants had no obligation to accommodate a need for reduced hours because the record does not show that Lee had any medical need for reduced hours.

Second, an employer is under no obligation to provide full-time benefits to part-time workers with disabilities, unless they do so for part-time workers without disabilities. See, e.g., Mastronicola v. Principi, No. 04-1655, 2006 WL 3098763, at *6 n.3 (W.D. Pa. Oct. 30, 2006) ("Mastronicola cannot insist on receiving [full-time employee] medical benefits" while working part-time "because no part-time VA food service worker, disabled or not, receives those

_____

[7] Resolving the motion on these grounds, the Court need not undertake a separate examination of Graves and Wolff's individual liability for "aiding and abetting" under state law.

benefits."); <u>Rahman v. Museum of Nat. Hist., City of N.Y.</u>, No. 10-921, 2012 WL 1077679, at *10 (E.D.N.Y. Mar. 30. 2012) ("[t]he ADA does not require an employer to pay an employee working a partial shift full-time wages.").[8] That Kinane previously offered Lee specially enhanced benefits (by reclassifying him as full-time but expecting only part-time work) does not change this analysis — Kinane's offer was a financial concession for an employee he wished to retain, not a disability accommodation. Its revocation is not relevant to Lee's claim.

Defendants did not ever deny Lee's first accommodation of starting late but they did deny Lee's second accommodation of receiving full-time benefits. Lee has cited no cases in support of the theory that Penn was obligated to provide him those full-time benefits while he performed only part-time work. Lee has not identified an instance where Defendants denied a reasonable accommodation. His disability discrimination claims cannot survive summary judgment.

b) <u>National Origin Discrimination</u>

Lee next advocates that he was a victim of discrimination by virtue of his Panamanian national origin. Both parties agree that the relevant test is the <u>McDonnell Douglass</u> burden-shifting framework. <u>See</u> <u>McDonnell Douglass Corp. v. Green</u>, 411 U.S. 792 (1973). To demonstrate prima facie national origin discrimination, Lee must show (1) he belongs to a protected class, (2) he was qualified for the position in question, (3) he was subjected to an adverse employment action despite being qualified, and (4) "the circumstances raise an inference of discriminatory action." <u>Burlington v. News Corp.</u>, 759 F. Supp. 2d 580, 592 (E.D. Pa. 2010) (Surrick, J.) (discussing <u>McDonnell Douglass</u>). The first two elements are undisputed. Where the parties differ is

---

[8] The record indicates only one other Penn employee who received full-time benefits while working part-time, "Dr. X1," but Defendants offered X1 similar options as they did to Lee: "fulfill the contract as written or . . . we could generate a new contract that reflected her real appointment." ECF 38-2 (Graves Dep.) at 119:8–19.

(1) whether Lee suffered an adverse employment action and (2) whether there is evidence of discriminatory intent.

For the purposes of this motion, the Court will assume that Lee suffered an adverse employment action when he lost his insurance subsidy. But his failure to provide any facts from which a reasonable jury could infer discriminatory intent is fatal to his claim. The Court will GRANT summary judgment regarding Lee's national origin discrimination claims.

     i.    <u>Adverse Employment Action</u>

Defendants argue that Lee has failed to identify an adverse employment action (i.e. a cognizable injury for discrimination claims). An adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." <u>Storey v. Burns Int'l Sec. Servs.</u>, 390 F.3d 760, 764 (3d Cir. 2004).

In support, Defendants correctly contend that the record is undisputed that Lee voluntarily resigned and was not terminated. The archetypical adverse employment action in a discrimination case is termination, but "an employee's voluntary resignation does not constitute an adverse employment action." <u>Larochelle v. Wilmac Corp.</u>, 210 F. Supp. 3d 658, 705 (E.D. Pa. 2016) (Stengel, J.).[9] Undisputed record evidence shows that Lee resigned in October 2018 after learning that he would not continue receiving full-time benefits. Defendants' decision not to renew his contract in July 2019 is irrelevant as Lee had resigned nine months before.

But this is not the only harm that Lee faced — Defendants removed the insurance benefits to which Lee believed he was entitled. The loss of health insurance coverage can constitute an

---

[9] Lee never asserted a "constructive discharge" argument nor does it appear that reducing his benefits to part-time subsidies would meet the threshold of effectively forcing him to quit.

adverse employment action,  see Williams v. Tucker, 857 F.3d 765, 769 (8th Cir. 2017) (losses of insurance benefits "exemplify adverse employment actions"), but only where the plaintiff is actually entitled to those benefits.  See Blair v. L.I. Child & Fam. Dev. Servs., Inc., No. 16-1591, 2017 WL 722112, at *11 (E.D.N.Y. Jan. 31, 2017) ("Without establishing that she was entitled to these benefits as part of her employment, she fails to plausibly plead that the withholding of disability forms and health insurance constitute an adverse employment action.").  The parties' briefing did not address whether Lee was entitled to full-time employee insurance benefits as a result of his deal with Kinane.  Nonetheless, the Court will assume for the purposes of this motion that Lee suffered from a cognizable adverse employment action when he lost continuing eligibility for full-time insurance benefits for performing the same work.

ii.   Discriminatory Intent

The lynchpin issue, therefore, is whether there is evidence from which a reasonable jury could contend that Lee lost his insurance benefits based on a discriminatory intent.  There is not.

It is undisputed that Wolff was the sole decisionmaker in the final termination of Lee's benefits.[10]  In his opposition brief, Lee relies only on Wolff's use of the word "mañana," the Spanish word for "tomorrow," as evidence that Wolff had discriminatory intent.

Lee did not testify to Wolff ever speaking Spanish to him or exhibiting racial bias that he saw.  But Lee did testify that other Penn employees, specifically Graves and Kinane, used the word "mañana" in connection with negative stereotypes of laziness and made other stray comments

---

[10] Graves testified that he had told Lee during their discussions that "ultimately I would not be the one deciding, so then this was passed on to Dean Wolff."  ECF 38-2 (Graves Dep.) at 191:8–14. In Lee's opposition memorandum, he did not contest Defendants' characterization of Wolff as the sole relevant decisionmaker, and at no point did he offer evidence that Graves remained involved in the final decision once Wolff became dean.

about perceived "macho" culture, both of which discriminated against Spanish speakers and Panamanians. Lee testified vaguely that Wolff "basically adopted . . . the same discriminatory posture against me" as Graves and Kinane. ECF 36-7 (Lee Dep.) at 25:22–26:3.

Depending on the circumstances, Graves and Kinane's purported behavior, if true, may have been inappropriate and could be evidence of discriminatory intent, but only if either had been the decisionmaker in the adverse action. "[C]omments by those individuals outside of the decisionmaking chain are stray remarks, which, standing alone, are inadequate to support an inference of discrimination." Burrows v. Twp. of Logan, 415 F. App'x 379, 383 (3d Cir. 2011) (quoting Walden v. Georgia Pacific Corp., 126 F.3d 506, 521 (3d Cir. 1997)). Such comments may be "circumstantial evidence of discrimination," Walden, 126 F.3d at 521, but "are insufficient to defeat summary judgment" without more. Burrows, 415 F. App'x at 384; accord Ballard v. Mercy Catholic Med. Ctr. of Se. Pa., No. 12-779, 2013 WL 3305235, at *7 (E.D. Pa. June 28, 2013) (Baylson, J.) (dismissing employment discrimination claim where only evidence of bias was racist comment by non-decisionmaker).

And Lee does not demonstrate any other evidence of discriminatory bias than those stray remarks. Wolff volunteered at his deposition that he used the word "mañana" on occasion for its explicit meaning. According to the record, Wolff never spoke Spanish in a derogatory manner or with or even in relation to Lee. There is no evidence of Wolff saying "mañana" in a context suggesting implicit endorsement of others' inappropriate stereotyping. Without any nexus to other discriminatory bias, no reasonable jury could find that Wolff's occasional use of a neutral, non-

English word demonstrates any discriminatory intent toward Spanish speakers.[11] Additionally, Lee offered no illustrative evidence of how Wolff adopted any discriminatory posture from Kinane or Graves, much less in a way that connected it to Lee's loss of insurance coverage.

Lee has therefore failed to provide evidence upon which a reasonable jury could conclude that he lost his benefits through discrimination, and his National Origin discrimination claim cannot survive summary judgment.

     c) <u>Defamation</u>

Lee's final claim is for defamation through libel and slander, specifically from statements made regarding Penn's investigation into complaints against Lee. Lee has identified no specific comments, either in writing or verbally, that are defamatory. The only specific statement he indicates are statements that any complaints against him were without merit. He has produced no other documents in connection with this investigation and has not shown that there were no complaints against him at all. <u>See</u> Section IV(b) (discussing Lee's contentions regarding investigation documents). As this Court already explained, "a writing stat[ing] that false allegations were indeed false is not sufficient to withstand dismissal." <u>Lee I</u>, 2019 WL 4060843, at *6. Without Lee identifying a single defamatory statement, the Court must GRANT Defendants' motion for summary judgment on Lee's defamation claims.

**VII.**   **<u>Conclusion</u>**

For the reasons given above, the Court will GRANT Defendants' motion for summary judgment on all counts. An appropriate order follows.

---

[11] There may, of course, be times when an employer uses an employee's native language in a way that produces derogatory implications, especially where the word carries significant or common connotations of negative stereotypes. This cannot reasonably be said to be one of those occasions.

O:\CIVIL 19\19-835 Lee v Univ of Penn Dental\Memo re MSJ.docx